## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ERNA DZANANOVIC,                     )
                                     )
      Plaintiff(s),                )
                                     )
      vs.                          )     Case No. 4:22-CV-1343 SRW
                                     )
KILOLO KIJAKAZI,                     )
Commissioner of Social Security      )
Administration,                      )
                                     )
      Defendant(s).                )

## MEMORANDUM AND ORDER

This matter is before the Court on review of an adverse ruling by the Social Security Administration. The Court has jurisdiction over the subject matter of this action under 42 U.S.C. § 405(g). The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. ECF No. 18. Defendant filed a Brief in Support of the Answer. ECF No. 21. Plaintiff did not file a Reply. The Court has reviewed the parties' briefs and the entire administrative record, including the transcripts and medical evidence. Based on the following, the Court will reverse the Commissioner's denial of Plaintiff's application and remand the case for further proceedings.

## I.   Factual and Procedural Background

On September 12, 2019 and November 21, 2019, Plaintiff Erna Dzananovic protectively filed applications for disability insurance benefits under Title II, 42 U.S.C. §§ 401, *et seq.*, and supplemental security income under Title XVI, 42 U.S.C. §§ 1381, *et seq*. Tr. 222-34. Plaintiff's applications were denied on initial consideration and reconsideration. Tr. 145-56, 159-64. On

January 11, 2021, she requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 167-81.

Plaintiff appeared for a video hearing, with the assistance of counsel, on November 3, 2021. Tr. 66-103. Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. *Id*. The ALJ also received testimony from vocational expert ("VE") Theresa Wolford. *Id*. On November 24, 2021, the ALJ issued an unfavorable decision finding Plaintiff not disabled. Tr. 42-65. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council. Tr. 219-21. On October 27, 2022, the Appeals Council denied Plaintiff's request for review. Tr. 1-6. Accordingly, the ALJ's decision stands as the Commissioner's final decision.

With regard to Plaintiff's testimony, medical records, and work history, the Court accepts the facts as presented in the parties' respective statements of facts and responses. The Court will discuss specific facts relevant to the parties' arguments as needed in the discussion below.

## II.    Legal Standard

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" § 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. § 416.920(a)(1). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether the claimant has a severe impairment "which significantly limits claimant's physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *see also* 20 C.F.R. § 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined as the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011); *see also* 20 C.F.R. § 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative

3

assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC, and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work which exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work which exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. § 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

If substantial evidence on the record as a whole supports the Commissioner's decision, the Court must affirm the decision. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary

sufficiency is not high." *Id.* Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The Court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id.* The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

## III.  The ALJ's Decision

Applying the foregoing five-step analysis, the ALJ found Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2017. Tr. 47. Plaintiff has not engaged in substantial gainful activity since the alleged onset date of March 31, 2017. *Id.* Plaintiff has the severe impairment of type 1 diabetes mellitus. Tr. 47-48. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. Tr. 49. The ALJ found Plaintiff has the following RFC through the date last insured:

> [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she must avoid climbing ladders, ropes and scaffolds. She must avoid working at unprotected dangerous heights or around unprotected dangerous machinery. She must avoid concentrated exposure to extreme heat and cold. She can frequently feel bilaterally. In addition, she must avoid jobs requiring her to operate a motorized vehicle.

Tr. 49-57.

The ALJ determined Plaintiff has no past relevant work. Tr. 57. She was born on September 4, 1993 and was 23 years old, which is defined as a younger individual age 18-49, on March 13, 2017, her alleged disability onset date. Tr. 58. Plaintiff has a limited education. *Id.*

5

The ALJ indicated the transferability of job skills is not an issue because Plaintiff does not have any past relevant work. *Id.* Relying on the testimony of the VE and considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were several jobs existing in significant numbers in the national economy which the Plaintiff could perform, including representative occupations such as Dining Room Attendant (*Dictionary of Occupational Titles* ("*DOT*") No. 311.677-018, with approximately 390,920 positions nationally), Linen Room Attendant (*DOT* No. 222.387-030, with approximately 213,239 positions nationally), Housekeeping Cleaner (*DOT* No. 323.687-014, with approximately 371,379 positions nationally), Routing Clerk (*DOT* No. 222.687-022, with approximately 74,788 positions nationally), Cafeteria Attendant (*DOT* No. 311.677-010, with approximately 73,085 positions nationally), Final Assembler (*DOT* No. 713.687-018, with approximately 229,240 positions nationally), Document Preparer (*DOT* No. 249.587-018, with approximately 97,252 positions nationally), and Polisher of Implants (*DOT* No. 713.687-034, with approximately 27,420 positions nationally). Tr. 58-59.

The ALJ concluded Plaintiff has not been under a disability, as defined in the Social Security Act, from March 31, 2017, through the date of his decision, issued on November 24, 2021. Tr. 27.

**IV.    Discussion**

Plaintiff presents three assignments of error: (1) the ALJ's decision failed to properly evaluate the persuasiveness of the medical opinion evidence; (2) the RFC is not supported by substantial evidence because the ALJ relied on the opinion of a non-examining physician formulated one year prior to the hearing; and (3) the ALJ failed to properly evaluate her subjective complaints of pain.

6

### A.  Evaluation of the Medical Evidence

The underlying record includes medical opinions from consulting physicians, Dr. Robert Cottone, Ph.D. and Dr. Judee Bland, M.D., as well as two of Plaintiff's treating physicians, Dr. David Glick, M.D. and Dr. Jennifer Gafford, Ph.D. Plaintiff contends the ALJ failed to properly discuss the supportability or consistency of their opinions, requiring the Court to reverse and remand this action for further agency review.

Claims filed after March 27, 2017, like Plaintiff's, require the ALJ to evaluate medical opinions pursuant to 20 C.F.R. § 404.1520c. This provision states the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Plaintiff's] medical sources." 20 C.F.R. § 404.1520c(a). Rather, an ALJ is to evaluate the persuasiveness of any opinion or prior administrative medical finding by considering the: (1) supportability of the opinion with relevant objective medical evidence and supporting explanations; (2) consistency with the evidence from other medical sources and nonmedical sources in the claim; (3) relationship with the plaintiff, including length, purpose, and extent of treatment relationship, whether it is an examining source, and frequency of examination; (4) specialization; and (5) other relevant factors. 20 C.F.R. § 404.1520c(c).

The rules make clear that supportability and consistency are the "most important factors;" therefore, an ALJ must explain how he considered these factors in the decision. 20 C.F.R. § 404.1520c(b)(2). An ALJ may, but is not required to, explain how she considered the remaining factors. *Id. See Brian O v. Comm'r of Soc. Sec.*, 2020 WL 3077009, at \*4 (N.D.N.Y. June 10, 2020) (quoting 20 C.F.R. § 404.1520c(a), (b)) ("Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning

'weight' to a medical opinion, the ALJ must still 'articulate how he or she considered the medical opinions' and 'how persuasive he or she finds all of the medical opinions.'" (alterations omitted)).

"The paragraph concerning the ALJ's evaluation of [a medical] opinion cannot be read in isolation but must be read as part of the overall discussion of plaintiff's RFC assessment." *Trosper v. Saul*, 2021 WL 1857124, at *5 (E.D. Mo. May 10, 2021). Therefore, in order to determine whether the ALJ properly analyzed the persuasiveness of the medical opinions, the Court must first review the ALJ's RFC assessment as a whole.

The ALJ first noted Plaintiff's "well-documented history of repeated non-compliance-related hospitalizations for diabetic ketoacidosis (DKA)," including "up until and after the time she alleges becoming disabled in March 2017." Tr. 51 (citing Tr. 333-500, 564-758, 1277-1356). For example, in December of 2014, medical records indicated she was "noncompliant with her insulin" resulting in a hospitalization; in January of 2015 her DKA was noted to be "likely due to poor compliance with insulin;" in February of 2015 she rejected the idea of seeing a diabetic educator or nutritionist despite being recommended to do so; and in April, February, August, November, and December of 2016 treating physicians continued to comment on her non-compliance with insulin treatment. Tr. 360, 403, 412, 420, 439, 471, 492, 572-73, 643, 671, 715, 753. Plaintiff was described to be underweight due to her noncompliance. Tr. 742. In December of 2016, records revealed a positive drug screen for THC, cocaine, and opioids. Tr. 704.

On January 24, 2017, approximately a month and a half before her alleged onset date, Plaintiff appeared to the emergency room ("ER") and was transferred to the intensive care unit. Tr. 759. Although she claimed she was using her insulin, she admitted she had not been watching her diet. Tr. 759, 766. The treatment notes indicated she was "well known to the Diabetes

8

Education Department for being highly noncompliant." Tr. 774. While hospitalized, an educator attempted to discuss treatment, but she was "mostly nonverbal." *Id.* Plaintiff reported she checked her blood glucose "sometimes," but gave no explanation for the infrequency. *Id.*

In addition to her non-compliant behavior, Plaintiff had a tendency to leave the hospital before a physician recommended discharge. Tr. 51, 470. In February of 2016, Plaintiff was readmitted several hours after she had left without a proper discharge. Tr. 588, 596, 599. She understood she was harming herself by leaving "AMA (against medical advice)." Tr. 599. The ALJ noted this pattern continued after her alleged onset date. Tr. 51. On September 30, 2018, Plaintiff appeared to the ER complaining of nausea, vomiting and abdominal pain five days after she underwent gallbladder removal surgery. Tr. 853-58. Aside from some post-operative bruising, her physical examination was otherwise unremarkable and her mental status was normal. Tr. 857. However, the attending physician did not recommend discharge because he wanted a complete laboratory evaluation, urinalysis, and CT scan of the abdomen. Tr. 858. Plaintiff did not comply with the physician's plan and checked herself out because she "was tired of being [t]here and want[ed] to go to a different hospital." *Id.* There is no indication in the record that she went to a different hospital. She did, however, attend a follow-up with her surgeon who noted good progress and issued a full surgical release with the ability "to resume unrestricted and complete physical activity." Tr. 847.

On December 17, 2018, Plaintiff returned to the ER for vomiting and abdominal pain. Tr. 860-63. Although she did not originally disclose the cause of her symptoms, she later admitted on re-evaluation that she had "drank a lot of alcohol" and was likely "just really dehydrated from being hung over." Tr. 862-63. She was described to be uncooperative with a physical exam; however, no significant abnormalities were evident and her mental status was normal. Tr. 864.

Imaging of her abdomen showed a small volume of pelvic free fluid, but no acute process was present. Tr. 867. The attending physician noted that a nurse visited with Plaintiff minutes after his initial examination and she was "completely alert, speaking in full sentences and was actively applying her makeup." Tr. 868.

Plaintiff was back in the hospital on January 6, 2019, after a car accident, but was discharged the same day in stable condition after unremarkable imaging and a relatively normal physical examination. Tr. 842-45. Plaintiff hired a lawyer shortly after the accident who advised her to undergo a physical and obtain an order for physical therapy. Tr. 1177-80.

On January 26, 2019, Plaintiff appeared to the ER with complaints of high blood sugar, nausea, vomiting, bloody emesis, abdominal pain, diarrhea, shortness of breath, weakness, and fatigue. Tr. 886. Abdominal imaging revealed some nonspecific pancolitis, a small amount of free fluid in the pelvis with bilateral follicular cysts, and fatty infiltration of the liver. Tr. 892. A physical exam showed mild distress and Kussmaul breathing with otherwise normal results. Tr. 888. During a discussion with the treating physician, she attributed all of her symptoms to drinking alcohol. Tr. 893. The physician informed her she had colitis and required antibiotics. *Id.* Plaintiff left the hospital against medical advice. Tr. 877, 885.

On February 11, 2019, Plaintiff returned to the ER with "epigastric pain" likely attributable to non-compliance with her diabetic medication. Tr. 792. She was noted to be uncooperative during the physical examination. Tr. 793. Again, she refused to be discharged by the attending physician and left against medical advice. Tr. 791.

In April of 2019, Plaintiff's primary care physician, Dr. David Glick, characterized her as "habitually non-adherent with the necessary glucose testing and SSI to improve glycemic control." Tr. 1174. Two months prior, he noted she "has never been able to adhere to the

recommended 4 times/day glucose testing necessary for individuals with Type 1 DM." Tr. 1181. He also indicated she used marijuana, on average, every two days. *Id.*

Plaintiff appeared to the ER on August 31, 2019, due to generalized pain and vomiting. Tr. 816. She admitted to being inconsistent with her insulin and indicated she had recently had a drink of liquor. Tr. 820. Aside from some tearfulness, her mental status was otherwise normal. Tr 824. She was discharged the following day with instructions to follow up with her family practitioner. Tr 816.

On October 4, 2019, Plaintiff returned to the ER with complaints of nausea, vomiting, and epigastric pain. Tr. 910, 912. Plaintiff told the attending physician she had recently seen Dr. Glick for epigastric abdominal pain, in which he tested her for H. Pylori and recommended an endoscopy, which she had yet to obtain. Tr. 912. Her physical examination was unremarkable and her mental status was normal. Tr. 914-15. She was diagnosed with cough, cyclic vomiting syndrome, epigastric abdominal pain, and cannabinoid hyperemesis syndrome. Tr. 919. The ALJ noted these ER records "indicate that her treatment provider found that the claimant's chronic marijuana use was the most likely etiology of her vomiting." Tr. 52.

From November 6, 2019 to November 9, 2019, Plaintiff was admitted to the hospital. Tr. 940. She had "stopped taking her insulin for [an] unknown reason" and could not remember the last time she took insulin as directed. Tr. 940, 946. Her lack of compliance seemed to not be attributed to any financial or insurance difficulties because she was noted to go to a clinic where she received free insulin. Tr. 970. She had also been given discount cards for her other medications; however, a later note indicated she began to take her medication as prescribed after she was approved for Medicaid. *Compare* Tr. 1480 to 1560. During the visit, plaintiff refused physician-recommended diabetes education. Tr. 1005-06. Although her physical and mental

status examinations were overall normal, she discharged herself against medical advice. Tr. 938, 948, 973.

On November 12, 2018, Dr. Glick indicated she was prescribed Metoclopramide for her abdominal pain, but she did not start the medication as directed. Tr. 1149. In December of 2019, Dr. Glick noted Plaintiff's "enormous struggle" with diabetes management. Tr. 1156. For example, "[i]t took her years before she even started carrying her glucometer with her everywhere she goes, which is a standard self-care strategy for individuals" with Type 1 diabetes. *Id.* As for her abdominal pain, Dr. Glick noted that once she started taking Metoclopramide it was "very effective" for symptom relief. *Id.* On May 2, 2019, September 5, 2019, and October 2, 2019, Dr. Glick noted Plaintiff's non-compliance in setting up care with an endocrinologist in order to help manage the diabetes. Tr. 1155, 1160, 1170.

Plaintiff was hospitalized twice in January of 2020 for insulin noncompliance. Tr. 1424. On the first visit, she left against the medical advice of her attending physician, and she was observed to be uncooperative and denied medications during her treatment. Tr. 1378, 1424. Dr. Glick expressed concern about her "poor adherence to treatment and repeated hospitalizations for DKA." Tr. 1135. In March of 2020, Dr. Glick noted Plaintiff's complete unwillingness to meet with a Diabetes Educator. Tr. 1140. In April of 2020, Dr. Glick indicated Plaintiff had failed to report for bloodwork or pick up her prescription for abdominal pain treatment. Tr. 1128, 1130. In May of 2020, he further indicated she had "never brought in a log of glucose values to discuss, nor ha[d] she ever brought her glucose meter to review the memory, discuss trends, or discuss examples of carb-counts[.]" Tr. 1124. He remarked on the numerous attempts he made to refer her to a university-based diabetes center, but she failed to make the referrals a priority. In the

same month, Plaintiff once again returned to the ER for elevated blood sugars and was quickly stabilized. Tr. 1458-66.

In July of 2020, Plaintiff appeared for a consultative examination with Deborah Wagner, P.A. Tr. 1034-41. Plaintiff reported experiencing neuropathy for the past five years due to diabetes. Tr. 1034. Although she reported foot pain, she stated she could "walk pretty far." *Id.* Plaintiff was observed to be in no acute distress with a normal gait, stance, and tandem walk. Tr. 1036. She was not noted to have any limitations in squatting, dressing, undressing, or getting on and off the examination table. *Id.* Her mental status was normal and she had no evidence of cognitive functional limitations. Tr. 1037. Although Ms. Wagner did not find any problems with Plaintiff's manual dexterity due to neuropathy, the ALJ explained he "restricted the claimant to frequent feeling to account for any neuropathy she may experience in the workplace." Tr. 54.

On February 23, 2021, Dr. Glick had a "lengthy discussion" with Plaintiff about his recommendations for her diabetes treatment. Tr. 1559. He was "perplexed" as to why she never followed through with the referrals. *Id.* Ultimately, he blamed her lack of compliance on "denial and apathy." *Id.* Dr. Glick attributed her weight loss to uncontrolled diabetes, and warned her that if she did not work towards better glycemic control, "she could easily be blind, on dialysis, and in a nursing home in 10 years." Tr. 1555-56.

On May 14, 2021, Plaintiff finally appeared for a new patient endocrine appointment as had been recommended. Tr. 1512-25. She admitted to poor diabetes management, but expressed her desire to make improvements. Tr. 1512. She received medication adjustments during the appointment and was referred for diabetes education, which she had previously rejected. Tr. 1519. She was also directed to see a gastroenterologist specialist to have her gastroparesis formally diagnosed. Tr. 1513. At the end of the month, Dr. Glick noted that Plaintiff brought in a

glucose log "for the first time ever," and her overall numbers were looking "much better." Tr. 1545. In June of 2021, treatment records with Plaintiff's "care manager," Jennifer Gafford, Ph.D., indicated she had finally accepted her diabetes diagnosis, was working hard to take care of herself, and self-reported "doing much better." Tr. 1544. In July of 2021, it was noted she was continuing to comply with physician recommendations, was still doing better, and was able to gain some weight. Tr. 1542.

As to the records indicating Plaintiff's improvement with compliance, the ALJ wrote, "The fact that her condition was always able to be quickly stabilized during her hospitalizations shows that her diabetes is adequately managed with medication compliance. Nothing convincing exists in the record to suggest that with continued compliance, the young claimant could not work on a full-time basis." Tr. 55. Thus, the ALJ determined: "Now that the claimant has committed herself to medication compliance, there is nothing persuasive in the record to suggest that she could not return to the workforce." *Id.*

The ALJ also reviewed Plaintiff's Function Reports, dated December 2019 and October 2020, in which she indicated she had difficulties in her activities of daily living due to low energy from her diabetes. Tr. 267-74, 292-99. She reported spending most of her days laying down or sleeping, but did not provide specifics into how her medical issues prevented her from maintaining her personal care. Tr. 268. The ALJ observed that Plaintiff's self-reported barriers were contrary to the medical record which expressly indicated she was independent in her activities of daily living. *See* Tr. 819, 969, 1376, 1480. The Court also observes that her medical records indicate she drives a car to medical appointments, while she contrarily self-reported in her Function Report that she does not drive. *Compare* Tr. 270 to 969, 1376, and 1480.

14

After reviewing Plaintiff's medical record and Function Reports, as summarized above, the ALJ evaluated the medical opinions. Tr. 56-57. The ALJ noted that consultative examiners, Harry Cole, M.D. and Robert Cottone, Ph.D., found, as of July 2020, that "[d]ue to lack of functional and medical evidence during the insured period, there [was] insufficient evidence in [the] file" to provide an opinion regarding Plaintiff's alleged disability pursuant to the Title II claim. Tr. 109-10. In October of 2020, state consultative agent, Gretchen Brandhorst, Psy.D., found no more than a mild impairment in psychological symptoms. Tr. 131-32, 138-39. The ALJ analyzed these opinions to "illustrate that the record did not support a finding of disability during the time leading up to her alleged disability onset date." Tr. 56.

As to the Title XVI claim, Dr. Cottone found there was adequate evidence, but it showed Plaintiff to be "no more than mildly impaired by [her] psych symptoms." Tr. 119-20. The ALJ found this opinion persuasive because "nothing convincing exists in the record to suggest the presence of any severe mental limitations" and "[a]s detailed above, the claimant's mental status examinations [were] routinely unremarkable throughout the record." Tr. 56. The ALJ acknowledged that although a form existed in the record indicating Plaintiff qualified for "MO HealthNet" for the Aged, Blind and Disabled," the social security agency is not bound to the disability decisions of other agencies. Tr. 56. *See also Hensley v. Colvin*, 829 F.3d 926, 935 (8th Cir. 2016) (an ALJ is not bound by the disability rating of another agency when evaluating whether the claimant is disabled for purposes of social security disability benefits).

In November of 2020, Judy Bland, M.D., another agency consultative examiner, evaluated Plaintiff's medical history. Tr. 133-34, 140-41. Dr. Bland limited Plaintiff to the medium-duty exertional level and found that the only additional limitation was to restrict her to frequent feeling bilaterally due to neuropathy. Tr. 133, 140. The ALJ found Dr. Bland's opinion

to be "generally persuasive" and added restrictions on the climbing of ladders, ropes and scaffolds and exposure to temperature extremes and hazards to account for any physical limitations she may experience in the workplace. Tr. 56.

The ALJ then analyzed the persuasiveness of Plaintiff's treating physicians. Tr. 56-57. The ALJ acknowledged that on September 28, 2020, Dr. Glick wrote in a treatment note: "[w]ith regard to her case for disability benefits, my opinion is that she is 100% disabled from seeking, maintaining gainful employment at this time." Tr. 1075. The ALJ found this statement to be unpersuasive and inconsistent with his own treatment notes. Tr. 56. Specifically, the ALJ pointed to Dr. Glick's own records indicating that Plaintiff's severe symptoms were due to her own non-compliance; improvement in her symptoms after compliance; her ability to access insulin at an affordable cost; substance abuse as a factor in her failure to comply with recommendations; and her refusal to take psychotropic medications or avail herself of counseling. Tr. 56-57.

As to Jennifer Gafford, Ph.D., the ALJ noted she completed Mental Medical Source Statements in September 2020 and October 2021. Tr. 1044-47, 1566-75. Within both reports, Dr. Gafford opined that Plaintiff had marked limitations in several areas, and her overall pace of production during an 8-hour workday would be at least 31% below average. Tr. 1044-45, 1566-67. Dr. Gafford also surmised that Plaintiff would be late or leave early at least three days per month and miss three days of work per month Tr. 1046, 1568. The ALJ found Dr. Gafford's opinions to be unpersuasive because she appeared to have relied heavily on the Plaintiff's self-reported physical complaints:

> There is nothing persuasive in the record to suggest that the claimant's overall pace of production would be "31% or more below average" or that she would be late or leave early three times per month or more. Furthermore, Dr. Gafford indicated in the notes that she was basing her opinion on was her initial visit with the claimant in 2015. The claimant does not appear to have had any significant sessions with Dr, Gafford again until October 2021 and Dr. Gafford conceded that

16

she had only treated the claimant "off and on" since age 21. In addition, Dr.
Gafford stated that the claimant's "primary concern" was her diabetes. While it is
conceivable that the claimant's diabetes contributes to her depression and that her
ADHD may cause some distractibility, her mental status examinations are
routinely normal throughout the record, as detailed above. Nothing convincing
exists in the record to suggest any severe mental impairment preventing the
claimant from working.

Tr. 57 (internal citations omitted).

Plaintiff argues the ALJ improperly evaluated the persuasiveness of psychological

consultative examiners, Drs. Cottone and Bland, and treating physicians, Drs. Glick and Gafford,

because he failed to properly explain how the supportability and consistency factors were

considered. Under the Social Security Regulations, ALJs are to consider all medical opinions

equally and evaluate their persuasiveness according to several specific factors – supportability,

consistency, the medical source's relationship with the claimant, specialization, and other factors

such as the source's understanding of the Social Security Administration's disability policies. 20

C.F.R. §§ 404.1520c(c), 416.920c(c). ALJs must "articulate in [their] determination or decision

how persuasive [they] find all of the medical opinions and all of the prior administrative medical

findings in [the] case record." 20 C.F.R. §§ 404.1520c(b), 416.920c(b).

As previously noted above, the factors of supportability and consistency are the most

important for the ALJ to address. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). An ALJ's

failure to address either the consistency or supportability factors in assessing the persuasiveness

of a medical opinion requires reversal. *Bonnett v. Kijakazi*, 859 Fed. Appx. 19 (8th Cir. 2021)

(unpublished) (per curium) (citing *Lucus v. Saul*, 960 F.3d 1066, 1069-70 (8th Cir. 2020)

(remanding because ALJ discredited physician's opinion without discussing factors

contemplated in the regulation, as failure to comply with opinion-evaluation regulation was legal

error)); *Starman v. Kijakazi*, 2021 WL 4459729, at *5 (E.D. Mo. Sept. 29, 2021) (same)

Although the Court finds that the ALJ here thoroughly summarized the medical record, and would otherwise affirm this action for substantial evidence supporting the determination, especially in light of Plaintiff's extreme disregard for her doctor's recommendations throughout her treatment, the ALJ simply did not explain how he considered either the supportability or consistency factors in determining the persuasiveness of Drs. Cottone and Bland's opinions. "No matter the adequacy of the ALJ's general summary of the evidence of record, []he nevertheless [must] abide by the Regulation's mandate to 'explain' the supportability [and consistency] of [a medical] opinion in view of such evidence." *Martini v. Kijakazi*, 2022 WL 705528 at *5 (E.D. Mo. Mar. 9, 2022); *see also Pipkins v. Kijakazi*, 2022 WL 218898 (E.D. Mo. Jan. 25, 2022) (finding that the ALJ's failure to "explain" and "articulate" the supportability and consistency of medical opinion evidence was reversible error even when the ALJ elsewhere adequately summarized the evidence of record, and it supported the RFC determination).

The ALJ in this case found Dr. Bland's agency opinion to be "generally persuasive, though the undersigned added restrictions . . . to account for any physical limitations she may experience in the workplace." Tr. 56. The ALJ included no further discussion. This conclusory statement unequivocally fails to discuss consistency or supportability. The ALJ did not engage in any discussion regarding how Dr. Bland's opinion of Plaintiff's functional limitations was consistent with the underlying record or supported. Finding a medical opinion generally persuasive without a discussion of supportability or consistency is an omission that *requires* remand. *See Pipkins*, 2022 WL 218898, at *4 ("Because the ALJ's cursory statement neither articulates the persuasiveness of [the doctor's] opinion nor explains the supportability or consistency factors in evaluating the opinion, it runs afoul of the Regulations.").

The Court cannot conclude that the ALJ's error was harmless. "An error is harmless when the claimant fails to 'provide some indication that the ALJ would have decided differently if the error had not occurred.'" *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020) (quoting *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012)). Dr. Bland's opinion was especially significant because the ALJ limited Plaintiff to medium work with frequent feeling due to her neuropathy, lifting and/or carrying up to 50 pounds, and lifting and/or carrying up to 25 pounds. This RFC mirrors the RFC formulated by Dr. Bland, *compare* Tr. 49 *to* Tr. 134-35, and the vocational expert testified to these specific limitations in order to determine what jobs Plaintiff could perform in the national economy, Tr. 94-102. Thus, if the ALJ had found Dr. Bland's opinion less persuasive, the ultimate disability determination might have been different.

As to Dr. Cottone's opinion, the ALJ found it was "persuasive since nothing convincing exist[ed] in the record to suggest the presence of any severe impairments" and because Plaintiff's "mental status examinations [were] routinely unremarkable throughout the record." Tr. 56. Although this is slightly more explanatory than the ALJ's analysis of Dr. Bland's opinion and arguably addresses how Dr. Cottone's opinion is supported by the record, it does not address the consistency factor. In fact, it is especially notable that the ALJ fails to address the inconsistency of Dr. Cottone's opinion that Plaintiff has no more than a mild limitation in her mental function with Plaintiff's documented ADD, ADHD, and depression diagnosis and propensity for apathy, which were all indicated by Dr. Glick to significantly affect Plaintiff's ability to comply with the treatment of her severe impairment. Tr. 542, 1232, 1559.

Furthermore, while the ALJ determined Dr. Glick's opinion of Plaintiff's complete disability from maintaining gainful employment was inconsistent with his own treatment notes, the ALJ did not discuss how the opinion was or was not supported by the remainder of the

record. While the Court might independently agree that Plaintiff was not disabled during the relevant time period, the Court simply cannot "fill in the gaps" for the ALJ. *Lucus v. Saul*, 960 F.3d 1066, 1069 (8th Cir. 2020). If the ALJ does not provide some explanation for a finding of inconsistency or supportability, the Court must reverse. *Id.*

Unlike the above stated issues with the opinions of Drs. Cottone, Bland, and Glick, the ALJ's analysis of Dr. Gafford's opinion appears to discuss the necessary factors. However, because the Court will be remanding this action, the ALJ should be clearer in stating which part of his analysis is intended to discuss the consistency and supportability factors.

Therefore, the Court finds that the ALJ erred in analyzing the persuasiveness of the medical opinion evidence. This error affected the ALJ's RFC determination, which renders it without the support of substantial evidence. As remand is required for revaluation of the opinion evidence of the consulting psychologists and RFC, the Court will not rule on Plaintiff's remaining arguments. *See, e.g.*, *Laramie v. Kijakazi*, 2023 WL 2610215, at *8 (E.D. Mo. Mar. 23, 2023); *Crews v. Kijakazi*, 2022 WL 4130793, at *4 (E.D. Mo. Sept. 12, 2022); *Hirner v. Saul*, 2022 WL 3153720, at *10 (E.D. Mo. Aug. 9, 2022). On remand, the ALJ must fully evaluate and explain the supportability and consistency of the medical opinion evidence, in accordance with 20 C.F.R. § 404.1520c.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner of Social Security is

**REVERSED** and that this case is **REMANDED** under 42 U.S.C. 1383(c)(3) and Sentence Four

of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

So Ordered this 20th day of November, 2023.

STEPHEN R. WELBY
UNITED STATES MAGISTRATE JUDGE